967 A.2d 376

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Leslie Charles X. BEASLEY, Appellant.**

Supreme Court of Pennsylvania.

Submitted April 9, 2007.

Decided March 18, 2009.

Robert Brett Dunham, Billy Horatio Nolas, Philadelphia, for Leslie Charles X. Beasley.

Amy Zapp, Harrisburg, Hugh J. Burns, Jr., Philadelphia, Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

Before CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice SAYLOR.[1]

This is a capital post-conviction appeal.

In April 1980, Appellant shot and killed the victim, Mr. Keith Singleton. Appellant was tried in 1981 and convicted of first-degree murder and possessing an instrument of crime. At the penalty hearing, the Commonwealth presented evidence in aggravation that Appellant had a significant history of violent felony convictions. *See* 42 Pa.C.S. § 9711(d)(9). Such history included two prior murders, one of which occurred in New Jersey when Appellant was sixteen years of age. The other was a few months after the murder of Mr. Singleton and involved the killing of police officer Ernest Davis, for which Appellant received a separate sentence of death.

Of particular relevance here, in the defense presentation at the penalty phase of trial, Appellant's trial counsel offered

---

1. This case was reassigned to this author.

only testimony from Appellant himself, asking him to explain the circumstances of his New Jersey offenses and to offer anything he wished to say concerning his personality and character. As presently characterized by the Commonwealth, Appellant was not directly responsive to the latter line of inquiry, but rather, he "inform[ed] the jury of his alleged mistreatment by the criminal justice system," yielding an "unsympathetic" presentation. Brief for Appellee at 15. Counsel then made the following brief closing argument:

I am going to say very little to you at this time, because I wouldn't presume to tell you how to decide this question that is coming before you. The reason I asked Mr. Beasley to take the stand was because I felt that you should know him a little bit as I know him, having represented him.

I want to draw your attention to the fact that the case which we heard so much about for the last two weeks is the case that now finally you have heard what really happened. An officer was shot, and Mr. Beasley was convicted of that crime. That incident pervaded this trial. We felt as if we were trying that case over again. The aura of that case pervaded this one.

I am not going to tell you anything about that case, as far as the legal arguments or the positions in the case, because I don't know. I was not his attorney in that case. I just want you to know that, in that case he does have an attorney. Motions have been filed with the Court claiming that certain errors were made. I don't even know what those errors are claiming to be, and that those motions have not been decided by the Court.

Therefore, the Court has not yet given its final judgment on that case.

As far as the Atlantic County case, I asked Mr. Beasley about it, and you heard what he said. And you can draw your own conclusions from that.

Again, I won't presume to tell you how to handle the situation. I will leave it up to you as citizens and human beings.

462

Thank you.

N.T., July 16, 1981, at 58–60.

Appellant was sentenced to death upon the jurors' finding of the significant-history aggravator and no mitigators. *See* 42 Pa.C.S. § 9711(c)(1)(iv). Trial counsel continued to represent Appellant through the direct appeal, in which this Court affirmed the judgment of sentence. *See Commonwealth v. Beasley,* 505 Pa. 279, 479 A.2d 460 (1984). Appellant pursued an initial post-conviction petition, which was dismissed in 1988, with that result being affirmed on appeal as well. *See Commonwealth v. Beasley,* 395 Pa.Super. 649, 570 A.2d 585 (1989), *appeal denied,* 527 Pa. 584, 588 A.2d 507 (1990).

In 1992, Appellant filed a second post-conviction petition, which is the subject of the present proceedings. In connection with this petition, Appellant submitted an affidavit of his trial counsel indicating, *inter alia,* as follows:

This trial was my first case involving a penalty-phase hearing on the application of the death penalty.

At the time of the trial, I was not aware that I could have introduced evidence at the penalty phase regarding psychological troubles that, even though not severe enough to merit a diminished capacity defense, the jury would nevertheless have been obligated to consider while making the decision whether or not to sentence Mr. Beasley to death.

At the time of trial, I was not aware that I could have introduced virtually any evidence at the penalty phase that would bear on Mr. Beasley's background, character, or moral culpability.

I spent very little time preparing exclusively for the penalty phase of trial. Virtually all of my penalty phase efforts were devoted to my attempts to exclude evidence of Mr. Beasley's conviction for the murder of a police officer, which conviction was not yet final, from being introduced as an aggravating circumstance. I performed no additional investigation for the penalty phase.

I never asked Mr. Beasley whether he had experienced, or been treated, evaluated or examined for, psychological trou-

bles or illness in the past, and Mr. Beasley never volunteered any such information.

I never asked Mr. Beasley whether he had any alcohol or drug abuse problems, and Mr. Beasley never volunteered any such information.

I never asked Mr. Beasley whether he had been subject to harsh physical punishment as a child, and Mr. Beasley never volunteered any such information.

I never asked Mr. Beasley to describe for me contributions that he had made to his community or his family through the course of his life, and Mr. Beasley never volunteered any such information.

I was not aware that Mr. Beasley had been hospitalized for mental illness at the age of 17, and never asked Mr. Beasley or his family any questions that would have elicited that information.

I met once with Mr. Beasley's family before the trial, and did not meet with them during the trial. I did not ask them any questions that would have elicited, or did elicit, any of the information referred to in the preceding five paragraphs.

I never asked Mr. Beasley or his family whether they knew of any other potential witnesses who would testify to either Mr. Beasley's character or to any other circumstances bearing on his moral culpability for the Singleton homicide.

I never undertook to obtain, assemble or present any evidence of Mr. Beasley's past psychological troubles because I believed that Mr. Beasley was competent to stand trial, and because he clearly did not suffer from a mental defect severe enough to warrant any diminished capacity defense during the guilt phase.

Before allowing Mr. Beasley to take the stand during the penalty phase of the hearing, I was not aware that Mr. Beasley had been diagnosed as suffering from severe verbal deficiencies, and was also not aware that a psychiatrist had concluded that because of his mental illness he tended to

lose thought control and become panicked and vague whenever emotionally stimulated.

Subsequently, Appellant requested funds to secure an evaluation by a mental-health expert, which the PCRA court (per Judge Papalini) denied via an order containing no explanation. Apparently, former PCRA counsel attempted to secure a mental health examination on a *pro bono* basis, but the expert whom he initially consulted indicated that he was unable to form an opinion as to Appellant's mental status due to the passage of fifteen years of time. *See* N.T., April 7, 1995, at 9, 12–13. The PCRA court proceeded to schedule an evidentiary hearing, limited to the issue:

> Was trial counsel ineffective in failing to present evidence at the penalty phase of trial concerning Petitioner's good behavior while in prison; his positive behavior as a father to his several children; and the alcoholism and neglect by his father?

Multiple substitutions of PCRA counsel ensued, and in 1998, the case was reassigned to Judge Savitt, followed by additional counsel substitutions.

At the evidentiary hearing, Appellant moved to expand the scope of the hearing and submitted affidavits from two forensic psychiatrists opining, *inter alia,* that, at the time of his offenses, Appellant suffered from severe mental-health impairments including schizoaffective disorder, which, had such impairments been developed before the jury, would have implicated two statutory mitigators. *See* 42 Pa.C.S. § 9711(e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance."), (e)(3) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired."). In response, the PCRA court inquired extensively into whether Judge Papalini had dismissed all claims other than the one subject to the evidentiary hearing, ultimately concluding that dismissal had not been effectuated. *See* N.T., June 5, 2000, at 32–48. Thus, the court recognized that, although it was proceeding on the basis of Judge Papalini's order limiting the scope of the hearing, it had the obligation to

address all of Appellant's claims.[2] The court also indicated that it would address the ruling with regard to the defense mental-health experts in connection with its opinion. *See* N.T., June 6, 2000, at 353.

Appellant proceeded to introduce records of a previous psychiatric hospitalization which had occurred prior to trial (when Appellant was seventeen), as well as various pre-sentence reports relating to other of Appellant's crimes, which contained indicia of mental illness.[3] *See, e.g.,* N.T., June 5, 2000, at 93, 106; N.T., June 6, 2000, at 375–76, 385.[4] Further, Appellant presented testimony from friends and family members concerning the hospitalization; Appellant's excessive drug and alcohol use; and irregular behavior on Appellant's part, such as climbing through windows for no apparent reason and attributing actions and events to an imaginary person. *See, e.g.,* N.T., June 6, 2000, at 260, 286–88, 332.

Appellant's PCRA counsel also questioned trial counsel, who indicated that he had much difficulty remembering the case; that his recollection was better at the time he executed his affidavit (1992); and that he did not have any reason to dispute the contents. *See, e.g.,* N.T., June 5, 2000, at 65–67. Various of counsel's responses to questioning concerning the failure to assemble mental-health records were as follows:

[The Court]: Did you get his hospital records?

A: I—as far as I know, Your Honor, I did not.

[The Court]: Okay. Do you know why you didn't?

2. *See* N.T., June 5, 2000, at 47–48 (reflecting the PCRA court's comments: "At the conclusion [of the hearing], when the matter is listed for argument, it will be really not so much on the Commonwealth's Motion to Dismiss, it will be on whether the PCRA Petition should be granted. I'll hear everything, and if I decide it, it will be an Opinion on everything because it's still opened and it's my obligation.").

3. The records indicated, *inter alia*, that Appellant was "at least, latent schizophrenic"; "his contact with reality is already severely impaired by his disease process"; and an "outbreak of open psychosis seem[s] possible."

4. As concerns the development of mental-health information, regardless of the PCRA court's indication that it would adhere to Judge Papalini's order, the proceedings moved beyond the limited scope set forth in that order.

A: I can't say at this point. I have to assume—now, this is hindsight, that—

[Counsel]: Your Honor, let me—

[The Court]: Go ahead. Let him answer.

[Counsel]: Let him answer, but I have objection to the hindsight.

[The Court]: That's okay. What is hindsight?

A: The jury had found Mr. Beasley guilty of first-degree murder and they had been informed by the Commonwealth that he had a death sentence in the other case and that he had a previous homicide in New Jersey.

My—I assume that my attitude at that point would be that the best thing I could do for him is to let him speak to the jury, if he wanted to, and he did, and that anything else that I could put in by way of his good behavior or such things would not only be irrelevant but that might actually be demeaning or be treated as a joke by the jury, and I just felt that the best thing I could do, probably the only thing could do at that point, is to let Mr. Beasley speak to the jury and that's what he wanted to do.

N.T., June 5, 2000, at 79–80.

On cross-examination, the district attorney developed that trial counsel had substantial criminal-law experience, *see* N.T., June 5, 2000, at 117–20; counsel regarded Appellant as an astute and intelligent man and saw no reason to doubt his mental capacity or emotional condition, *see id.* at 115–16; and, to the best of counsel's recollection, Appellant and his family never volunteered information regarding mental-health illness, alcohol or drug abuse, harsh treatment during Appellant's youth, or positive contributions to the community, *see id.* at 124–25, 127. Further, the following interchange occurred between the district attorney and trial counsel:

Q: Given Mr. Beasley's track record of arrests, two prior homicides, did you think that it was a fruitful area of inquiry to look into his past record as to positive contributions in the community? Or did you think that was necessarily going to be a—

A: All I can say is what I alluded to before is that, given that situation in a courtroom with a jury who had just found him guilty—

Q: Right.

A:—I think that introducing that type of evidence might be considered laughable by the jury.

Q: And if I understand you correctly, sir, when you say it might be laughable, you understood that if you put those kinds of witnesses on to talk about positive things in the community that Mr. Beasley might have done, you knew that the prosecutor in this case, Mr. McGill, would have asked those witnesses about every arrest that this defendant had?

A: Of course, yeah.

Q: And he would have brought out that he had two prior homicides including the homicide of a Philadelphia police officer on duty; correct?

A: Well, he already put that into evidence. The jury already knew that.

Q: And did you see any purpose in reinforcing that with former testimony of family members or character witnesses?

A: I can't imagine that would benefit the defendant.

N.T., June 5, 2000, at 126–27. Counsel also corrected the statement in his affidavit that he was not aware that he could have introduced any evidence bearing on Appellant's background, character or moral culpability, since he had asked Appellant an open-ended question concerning his personality and character at the penalty phase of trial. *See id.* at 129–30. In this regard, counsel explained that someone else drafted the affidavit, and he apparently was not careful when he reviewed it. *See id.* at 151–52. Further, the district attorney sought to establish that trial counsel had in fact performed some penalty investigation, as follows:

Q: Sir, I want to ask you about No. 6 in your Affidavit there.

468

It says: "I spent very little time preparing exclusively for the penalty phase of the trial. Virtually all of my penalty phase efforts were devoted to my attempts to exclude evidence of Mr. Beasley's conviction for the murder of a police officer, which conviction was not yet final, from being introduced as an aggravating circumstance. I performed no additional investigation for the penalty phase."

Am I correct in reading that you are not saying you produced—strike that.

You are not saying you performed no investigation for the penalty phase; you're simply saying that you didn't perform it in some exclusive fashion other than the guilt phase, correct?

A: I think that's true, yes.

Q: In other words, you'll agree with me that many issues in a criminal trial, especially a murder trial, many issues regarding the guilt phase necessarily involve looking into the character and background of the defendant and those sorts of things?

A: Yes.

Q: And making determinations as to whether there is a mental health defense; correct?

A: Of course, yes.

Q: And those are all things you did in this case; correct?

A: Yes.

N.T., June 5, 2000, at 132–33.

Upon inquiry from the PCRA court concerning whether counsel had anything else to say about his conduct of the trial, counsel indicated as follows:

A: I think the only thing I could add to what I've already said, Your Honor, is that when the Court ruled that the Commonwealth could introduce evidence of the other death sentence, I felt that the jury was really having the issue taken away from them at that time, that there was really very little for the jury to decide.

Q: Okay.

A: And that's why I so vehemently disagreed with the Court's ruling on that.

Q: So you said in preparing for the penalty phase you were largely trying to avoid that coming in?

A: That was the biggest point, yes.

Q: There was a conviction had occurred but it hadn't been final?

A: That's correct.

Q: Once you lost that, you felt it was a losing cause that you were in a difficult situation?

A: I wouldn't say that. I would say that the jury was looking at a defendant who they knew had another death sentence and had, yet, another homicide conviction, and that for me to try to mitigate that by evidence of good conduct or something of that sort would not be helpful and might actually demean the dignity of the case.

N.T., June 5, 2000, at 135–36.

On redirect, PCRA counsel sought to counter the Commonwealth's suggestion of a joint guilt-/penalty-phase investigation, eliciting counsel's testimony that: "I don't recall looking into [Appellant's] mental health history at all." N.T., June 5, 2000, at 141.

In addition to the mental-health aspect, Appellant sought at the hearing to establish that trial counsel was ineffective for failing to present mitigation evidence concerning Appellant's life history. In this regard, he presented testimony from family members and friends indicating that his father suffered from alcoholism and was not present during much of Appellant's upbringing; when the father was present, there were violent confrontations between him and Appellant's mother, in which Appellant often attempted to intervene, *see, e.g.,* N.T., June 6, 2000, at 205–06; these include an incident in which the father chased family members with a machete, *see, e.g., id.* at 207; Appellant was whipped with a "belt or a rope or an iron cord or anything [the father] got [his] hands on," *id.* at 208; and Appellant acted as a father figure in his father's absence and as a stabilizing influence in a neighborhood afflicted by

racial tensions, *see id.* at 207–08, 355. Finally, testimony was adduced from a prison worker, who indicated that Appellant followed the rules and was non-violent while incarcerated. *See* N.T., June 13, 2000, at 431–34. The district attorney countered by eliciting testimony that counsel was concerned that character evidence would draw out evidence of other aspects of Appellant's criminal history in rebuttal. *See* N.T., June 5, 2000, at 126, 131.

Subsequent to the hearings, the PCRA court denied relief on all claims. However, despite the court's indication that it would prepare a comprehensive opinion, *see supra* note 2, the court's opinion addressed only Appellant's contention that his trial counsel was derelict in the investigation and presentation of mitigating evidence at the penalty phase.[5]

As to that claim, the PCRA court believed that it was clear from the record that trial counsel did, in fact, consider the presentation of mental-health and other mitigating evidence, but he had ruled it out as being likely to do more harm than good. *See Commonwealth v. Beasley,* No. 0969 Nov. Term 1980, *slip op.* at 6 (C.P.Phila.Feb.20, 2001) (citing N.T., June 5, 2000, at 133). According to the court:

> After failing to prevent the defendant's prior homicide convictions from being admitted, [trial counsel] recognized

---

**5.** To obtain relief on a claim of ineffective assistance of counsel, a petitioner must demonstrate that the underlying claim is of arguable merit, no reasonable basis existed for counsel's action or inaction, and counsel's error caused prejudice such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *See Commonwealth v. Pierce,* 567 Pa. 186, 203, 786 A.2d 203, 213 (2001); *Commonwealth v. Kimball,* 555 Pa. 299, 312, 724 A.2d 326, 333 (1999); *see also Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (explaining that, to support an ineffective assistance claim, a defendant must show that counsel's performance was deficient and that such deficiencies prejudiced the defense). Counsel is presumed to have rendered effective assistance, *see Commonwealth v. Basemore,* 560 Pa. 258, 277 n. 10, 744 A.2d 717, 728 n. 10 (2000), and, if the petitioner fails to satisfy any prong of the ineffectiveness inquiry, his claim will be rejected. *See Commonwealth v. Malloy,* 579 Pa. 425, 448, 856 A.2d 767, 781 (2004).

Serial post-conviction petitions, such as the present one, are also subject to a miscarriage-of-justice standard. *See Commonwealth v. Lawson,* 519 Pa. 504, 513, 549 A.2d 107, 112 (1988).

that the danger in presenting allegedly mitigating evidence regarding the defendant's past was that the jury might view it as "laughable" under the circumstances. (N.T. 6/5/00, 80, 125–127, 131, 136). Thus, further investigation of the defendant's mental state was not necessary for counsel's defense strategy and counsel cannot be held in error for failing to uncover evidence of that nature. Counsel's action was reasonably calculated to best promote the defendant's interests during the penalty phase of trial.

*Id.* at 6. The court also focused on counsel's stated concern regarding Appellant's criminal history. *See id.* at 7 ("[Trial counsel] had a reasonable basis for his defense strategy. It was his belief that the evidence he could have presented as mitigating evidence would have done more harm than good. It is certainly reasonable that that the positive effect of any testimony from friends or family would be overshadowed by further testimony of the defendant's criminal and violent past that the prosecutor would surely elicit.").

Touching on the mental-health aspect, the court explained that this Court, as follows, had already discredited these reports as mitigating evidence in its opinion denying postconviction relief relative to the death sentence imposed for the killing of Officer Davis:

> [T]hese records contained other revelations which cast appellant in a bad light. E.g., he had fathered three children out of wedlock by age seventeen; he was the defendant in a pending murder case; and he was described in a psychological examination as aggressive with fantasies of violence. In light of the numerous detrimental entries, counsel cannot be faulted for not introducing these records at the penalty phase. *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513 (1988).

*Beasley*, No. 0969 Nov. Term 1980, *slip op.* at 6 (quoting *Commonwealth v. Beasley*, 544 Pa. 554, 566 n. 8, 678 A.2d 773, 778–79 n. 8 (1996)).

Ultimately, the PCRA court indicated that trial counsel "performed effectively and executed a thoughtfully considered

trial strategy." *Beasley,* No. 0969 Nov. Term 1980, *slip op.* at 9.

Appellant lodged the present direct appeal from the denial of post-conviction relief.[6] Our standard of review is limited to examining whether the court's findings of fact are supported by the record and whether its legal conclusions are free of error. *See Commonwealth v. Sneed,* 587 Pa. 318, 324–25 n. 6, 899 A.2d 1067, 1071 n. 6 (2006).

Presently, Appellant takes issue with the legal framework within which the PCRA court assessed his penalty-phase ineffectiveness claim, contending that the court's approach is irreconcilable with that applied by the United States Supreme Court and in the conforming decisions of this Court, which have emphasized counsel's obligation to conduct a thorough investigation in the first instance, *see Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000); *Commonwealth v. Gribble,* 580 Pa. 647, 681, 863 A.2d 455, 475 (2004) (same), and have directed a specific focus to the reasonableness of the pre-hearing investigation. *See, e.g., Wiggins v. Smith,* 539 U.S. 510, 522–23, 123 S.Ct. 2527, 2536, 156 L.Ed.2d 471 (2003) ("[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the petitioner's] background *was itself reasonable.*" (emphasis in original)); *Sneed,* 587 Pa. at 338, 899 A.2d at 1079 (same). According to Appellant, the "strategic choices" referenced by the PCRA court are not creditable, because there simply was no underlying investigation to support them and no reason to omit the essential inquiry. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066 (explaining that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation"); *Commonwealth v. Malloy,* 579 Pa. 425, 460, 856 A.2d 767, 788 (2004) (same).

6. Unfortunately, the appeal remained essentially inactive on this Court's docket for a period of five years before a briefing schedule issued. The Court recognizes the impact of the serious delay occurring in capital cases and is taking measures to prevent a recurrence in this and other cases.

Appellant points to the evidence that trial counsel performed no investigation of Appellant's life history and mental-health problems and, at the time of trial, was not even aware that a much broader range of mental health information could be introduced in a capital case than a non-capital one. Appellant asserts that counsel's failure to reasonably investigate Appellant's background and mental health is reflected in his sentencing presentation, where he introduced only testimony from Appellant, whom both parties recognize performed very poorly. Appellant also contends that, had counsel conducted a reasonable investigation, he would have learned from available records that Appellant was seriously mentally ill, making it unlikely that he would perform as an effective witness, since he was characterized in those records as grandiose and paranoid, lacking in judgment and insight, illogical, unable to communicate effectively, as well as with affect and verbalizations inappropriate to prevailing circumstances. Appellant argues that, having investigated nothing and presented nothing, counsel made an exceptionally brief and empty closing argument to the jury, failing in any way to advocate for a life sentence.

According to Appellant, the information available through an adequate investigation contained numerous "red flags" demonstrating a need for evaluation by mental health professionals. Appellant argues:

> The experts explain that Appellant suffers, and suffered at the time of the offense, from significant mental health deficits as a result of his severely traumatic childhood; he suffers, and suffered at the time of the offense, from schizoaffective disorder, a major mental illness characterized by a combination of psychotic symptoms associated with schizophrenia and affective symptoms associated with a major mood disorder; the symptoms of his mental illness include central nervous system impairments, impaired impulse control, feelings of worthlessness and despair, depression, self-destructive behavior, post-traumatic stress symptoms, inability to concentrate, inability to make reasonable decisions or judge the consequences of actions, impaired

judgment, lack of insight, social withdrawal, disruptions of mood and affect, mania, grandiosity, impairments in ability to think abstractly, logically or rationally, delusions, hallucinations and lack of contact with reality; he suffered at the time of the offense from the debilitating interactive effects of his traumatic childhood, his major mental illness, and his severe drug and alcohol problems; at the time of the offense he was suffering from extreme mental and emotional disturbances and a substantially impaired capacity to appreciate the consequences of conduct or to conform conduct to the requirements of the law[.]

Brief for Appellant at 21–22. Appellant stresses that, contrary to its indication during the post-conviction hearings, the PCRA court failed to address, or even mention, Appellant's proffered expert mental-health testimony.

Appellant also asserts that the PCRA court erred in stating that trial counsel made a tactical decision to forego all types of mitigation because he believed "that the jury might view [mitigation] as 'laughable' under the circumstances," given Appellant's prior homicide convictions. *Beasley*, No. 0969 Nov. Term 1980, *slip op.* at 6. Appellant explains that counsel never claimed that he had a tactical reason for failing to introduce mitigating evidence about Appellant's childhood, history of mental impairments, and persisting mental disturbances. Instead, counsel testified that he thought, given Appellant's criminal history, that evidence of Appellant's *"positive contributions to the community* ... might be considered laughable by the jury." N.T., June 5, 2000, at 126 (emphasis added); *see also id.* at 136 ("the jury was looking at a defendant who they knew had another death sentence and had, yet, another homicide conviction, and ... for me to try to mitigate that by evidence of *good conduct* or something of that sort would not be helpful" (emphasis added)).[7]

7. Appellant also asserts that his claim is not previously litigated or waived. In this regard, although a similar one was pursued in Appellant's earlier post-conviction petition, Appellant notes that it was presented in a single sentence in a boilerplate fashion. Furthermore, Appellant explains that the previous post-conviction court ordered counsel to specify what mitigation could have been presented, but

In response, the Commonwealth initially highlights Appellant's election to testify at the penalty phase, indicating that the decision in this regard belonged to Appellant. Further, the Commonwealth argues that counsel's recommendation to Appellant to testify was objectively reasonable, given the substantial need to humanize Appellant in light of his criminal history including three killings. The Commonwealth faults Appellant for his unsympathetic performance during his testimony, and couches trial counsel's closing argument as an effort to "humbly implor[e] the jury for mercy." Brief for Appellee at 15. In reply to Appellant's assertion that his mental illness made it inevitable that he would do more harm than good by testifying at the PCRA hearing, the Commonwealth suggests that trial counsel specifically refuted this notion in his characterization of Appellant as being "quite an astute and intelligent man." For this reason, and in light of the fact that they conferred frequently prior to trial, the Commonwealth contends that trial counsel simply had no reason to doubt Appellant's mental capacity or emotional stability. The Commonwealth observes that the most significant documentary evidence of mental deficiency on Appellant's part was substantially dated and points to this Court's comment in Appellant's direct appeal from his other sentence of death that: "We do not regard [evidence] which related only to the duration of childhood alcoholic blackouts suffered by appellant so many years previous, as having been evidence of mitigation relevant to the present offense." *Commonwealth v. Beasley*, 504 Pa. 485, 501–02, 475 A.2d 730, 739 (1984). The Commonwealth minimizes the weight of Appellant's life-history mitigation in relation to cases such as *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), and

counsel never responded, and successor counsel never pursued the matter at all. *See generally* N.T., May 3, 1993, at 36–37. Thus, Appellant asserts that the matter has never been substantively presented to a court of law, and any waiver is overcome by prior counsel's failure, without justification, to properly raise and litigate the claim. *See Commonwealth v. Williams*, 597 Pa. 109, 128, 950 A.2d 294, 305 (2008) ("Deficient stewardship is manifest where, as here, successor lawyers raise the relevant claim but fail to develop it in a fashion which could possibly yield relief, thereby causing the claim to be rejected summarily.").

*Wiggins,* in which counsel have been deemed ineffective, and references *Commonwealth v. Cross,* 535 Pa. 38, 634 A.2d 173 (1993), for the proposition that the presentation of evidence of a defendant's childhood difficulties proposed as mitigating evidence could be perceived by the jury as trivializing his crime.

Additionally, the Commonwealth argues that the PCRA court was correct in its assessment that presenting family members and friends to testify about Appellant's alleged positive characteristics would have opened the door for the Commonwealth to question these witnesses about their knowledge of Appellant's full criminal record. In any event, the Commonwealth contends that the life-history evidence could not offset the substantial aggravation. *See* Brief for Appellee at 18 ("While Appellant now claims that this consideration [concerning his criminal history] was negligible given that the jury knew that he had committed three murders, this argument only highlights the futility of Appellant's hindsight strategy of presenting family members and friends. Three murders simply are not mitigated by testimony of witnesses who are clearly biased in the defendant's favor."). Similarly, the Commonwealth advances the PCRA court's reasoning that the mental-health records would have cast Appellant in a bad light, as, for instance, he was described in a psychological evaluation as aggressive with fantasies of violence. *See Beasley,* 544 Pa. at 566 n. 8, 678 A.2d at 778–79 n. 8. According to the Commonwealth, the fact that Appellant subsequently located mental health witnesses who, despite the passage of time, were willing to form opinions as to Appellant's mental state in 1980 does not diminish the validity of prior counsel's strategic choice not to further this line of inquiry.

Finally, the Commonwealth complains about the present state of capital jurisprudence, as follows:

> In the more than two decades since Appellant's trial, the law concerning penalty phase presentations has significantly changed. Formerly, courts were unreceptive to the view that capital juries would be favorably impressed to learn that the convicted murderer before them was the product of

a "dysfunctional and violent family," had a history of drugs and/or alcohol abuse, or lacked impulse control.[8] The omission of such evidence at a capital sentencing hearing now generates a claim of ineffective assistance. However, in evaluating whether an attorney's performance is constitutionally deficient, the law continues to reject hindsight analysis. *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Appellant cannot show that counsel's performance was deficient under the law as it existed at the time he acted, relief must be denied.

---

[8] *See e.g., Burger v. Kemp,* 483 U.S. 776, 792–96, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (discussing the pitfalls of presenting such evidence).

Brief for Appellee at 15–16.

■ Upon our review, the PCRA court's order cannot be sustained on its terms. First, there is no reasoning provided with regard to most claims asserted in the PCRA petition, despite our emphasis on the need for developed, independent reasoning from our post-conviction courts. *See, e.g., Commonwealth v. Williams,* 557 Pa. 207, 224–25, 232–33, 732 A.2d 1167, 1176, 1189–90 (1999). Indeed, the PCRA court recognized its obligation to address all claims, *see supra* note 2, but, for reasons which are unknown, it did not fulfill that duty. We recognize the age of this case, the serial nature of the post-conviction petition, and the unfortunate delays that have occurred at all levels. Nevertheless, the interests of justice require that complete and correct judicial administration be accomplished by our courts, and in this case a remand is necessary for such purpose.

With regard to the ineffectiveness claim that was addressed by the PCRA court, the denial also cannot be sustained based on the reasons provided by that court. Whereas the required focus is on trial counsel's pre-trial investigation, *see, e.g., Sneed,* 587 Pa. at 338, 899 A.2d at 1079, the PCRA court focused on circumstances occurring at the time of the penalty

hearing to validate counsel's performance.[8] Furthermore, while the court correctly noted that trial counsel expressed a concern regarding the seriousness of mitigation evidence that went to good conduct on Appellant's part, it was not justified in expanding this explanation as a reason to support a truncated (or absent) investigation into other forms of mitigation evidence, including evidence of mental illness and/or a traumatic past. *See generally Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." (quotation omitted)). Similarly, counsel's stated concern with the potential for other-crimes evidence to be introduced in Commonwealth rebuttal also does not extend to all forms of mitigating evidence,[9] and, moreover, it is an inadequate ration-

**8.** The court indicated that *"[a]fter failing to prevent the defendant's prior homicide convictions from being admitted,* [trial counsel] recognized that the danger in presenting allegedly mitigating evidence regarding the defendant's past was that the jury might view it as 'laughable' under the circumstances." *Beasley*, No. 0969 Nov. Term 1980, *slip op.* at 6 (emphasis added). Counsel's objection to the admission of the convictions was asserted in chambers at the outset of the penalty phase of Appellant's trial. *See* N.T., July 16, 1981, at 13.

Similarly, trial counsel's explanations for his failure to investigate were similarly focused on the prevailing circumstances as they unfolded at the penalty phase of trial, rather than the pre-trial period. *See, e.g.,* N.T., June 5, 2000, at 79–80 ("The jury had found Mr. Beasley guilty of first-degree murder and they had been informed by the Commonwealth that he had a death sentence in the other case and that he had a previous homicide in New Jersey.) My—I assume that my attitude *at that point* ..." (emphasis added); *id.* at 126–27 ("All I can say is what I alluded to before is that, given the situation in a courtroom with a jury who had just found him guilty ...").

**9.** In *Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761 (2004), this Court explained that not all mitigation evidence will implicate rebuttal entailing evidence of the defendant's prior crimes. *See id.* at 333–34 & n. 40, 865 A.2d at 797 & n. 40. Although *Hughes* was decided long after Appellant's trial, the *Hughes* Court explained that the appropriate scope of rebuttal has always been defined according to the evidence which it is offered to rebut. *See id.* (citing *Commonwealth v. Hickman*, 453 Pa. 427, 432, 309 A.2d 564, 567 (1973)).

alization to support a failure to collect information in the first instance.

Further, trial counsel's reference on cross-examination to a joint guilt-penalty phase investigation is abstract, and we decline to credit the court's finding in this regard at this juncture, without some treatment of counsel's more specific testimony, repeatedly expressing his belief that he did not collect mental-health/life-history records or seek to have Appellant examined by a mental-health professional. *Accord Commonwealth v. Gorby*, 589 Pa. 364, 390, 909 A.2d 775, 791 (2006) (rejecting the PCRA court's analysis where it "was able facially to support a conclusion that counsel was effective on this record only by characterizing the case in fairly abstract terms"). Our reservation in this regard is particularly in light of trial counsel's actual performance in his penalty-phase closing argument, which is lacking in substance and in which counsel failed to so much as ask for a life sentence on his client's behalf. *See* N.T., July 16, 1981, at 58–60 ("I am going to say very little to you at this time, because I wouldn't presume to tell you how to decide this question that is coming before you."); *cf. Williams*, 529 U.S. at 415, 120 S.Ct. at 1525 (O'Connor, J., concurring) ("The consequence of counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances manifested itself during his generic, unapologetic closing argument, which provided the jury with no reasons to spare petitioner's life."). Additionally, had trial counsel obtained the records of Appellant's prior psychiatric hospitalization describing his grandiose demeanor and inappropriate affect and verbalizations, counsel might have anticipated Appellant's poor performance as a witness at the penalty phase of trial. Indeed, those records contain the following comment: "In the short interview the patient had with the examiner, it became quite clear that this young man would always come out as the loser in any court trial or any cross-examination, because of his inability to express his thoughts." At a minimum, such commentary would suggest investigation into other avenues of presenting mitigating evidence. Yet there is no

finding by the PCRA court that trial counsel sought out the records of Appellant's psychiatric hospitalization and previous mental health examinations, and, certainly, the weight of the evidence is to the contrary.

 The PCRA court was correct that this Court previously discounted the significance of such records in terms of their independent value as mitigation evidence. *See Beasley,* 544 Pa. at 566 n. 8, 678 A.2d at 778–79 n. 8.[10] The Court, however, offered *no comment in terms of the records' significance as an impetus to further inquiry. See, e.g., Commonwealth v. Satta-zahn,* 597 Pa. 648, 675, 952 A.2d 640, 656 (2008) (affirming a PCRA court's determination that records of prior psychological examinations contained "red flags," indicating a need for further investigation into a capital defendant's mental health). Significantly, one of the psychiatrist declarations presented by Appellant at the post-conviction stage indicates that "[a]ny competent mental health professional would recognize that Mr. Beasley's background presents significant indicia of mental illness, and calls for a complete evaluation of his impaired mental health." Declaration of Robert A. Fox, M.D. (Sept. 26, 1997). Again, however, the PCRA court failed to address this or any other aspect of the psychiatrist declarations.[11]

It certainly is possible that a defense attorney sympathetic to his former client might present an affidavit containing

10. Again, this discussion occurred in the context of Appellant's other trial for first-degree murder.

11. Where there is an adequate proffer, a PCRA petitioner alleging ineffective assistance of counsel connected with the investigation and presentation of mitigating evidence should be permitted to develop an actual case of mitigation on the post-conviction record, given the requirements to establish the absence of a reasonable strategy and prejudice. *See generally Commonwealth v. Williams,* 557 Pa. 207, 248, 732 A.2d 1167, 1189 (1999) (explaining that the full ineffectiveness inquiry pertaining to the asserted failure to present adequate mitigation will entail a comparison of the mitigation evidence that was presented in the penalty phase of trial in relation to that which the defendant later claims); *accord Malloy,* 579 Pa. at 461, 856 A.2d at 789 ("[I]n considering whether appellant was prejudiced we must consider not only the evidence and argument presented at the penalty phase, but also the evidence and argument that *would have been* presented at the penalty hearing had trial counsel properly investigated such evidence." (emphasis in original; citations omitted)).

falsehoods in furtherance of the client's cause. In such a case, where the post-conviction court has reasonable grounds to disbelieve counsel, it may make an express credibility determination rejecting the evidence. The PCRA court's opinion here, however, does not contain such an express credibility finding. Rather, the court simply did not address trial counsel's affidavit or the conforming testimony, with which the PCRA court's finding of a "thoughtfully considered trial strategy" cannot be reconciled.

With regard to the Commonwealth's complaint that the courts have altered their approach to ineffectiveness claims in the capital arena, the only decision referenced by the Commonwealth to support its perspective is *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). Significantly, however, in that case, the defendant had no history of criminal offenses, *see Burger,* 483 U.S. at 792, 107 S.Ct. at 3124 ("As the record stood, there was absolutely no evidence that [the] petitioner had any prior criminal record of any kind."), casting investigative limitations and the decision whether to present mitigation in a substantially different light than in the present case, where the evidence in aggravation subsumed two prior murder convictions, with one involving the killing of a police officer for which Appellant already had received a death sentence. *See generally Simmons v. Luebbers,* 299 F.3d 929, 938–39 (8th Cir.2002) ("By the time the state was finished with its case, the jury's perception of [the appellant] could not have been more unpleasant. Mitigating evidence was essential to provide some sort of explanation for [the appellant's] abhorrent behavior. Despite the availability of such evidence, however, none was presented. [The appellant's] attorneys' representation was ineffective."). Furthermore, we have previously commented that these cases are highly fact-dependent, impeding generalizations in terms of outcomes. *See Commonwealth v. Gibson,* 597 Pa. 402, 421, 951 A.2d 1110, 1121 (2008). Notably, the Commonwealth can point to no case in which any court has characterized conduct such as that described in trial counsel's affidavit as adequate stewardship.[12] Moreover, over

12. We recognize that a heavy measure of deference is due to counsel's judgment, *see Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066;

dissenting opinions expressing the same perspective as the Commonwealth offers here, the United States Supreme Court has maintained that its opinions in the *Williams* and *Wiggins* line "made no new law," but rather, represent an application of clearly established precedent. *Wiggins,* 539 U.S. at 522, 123 S.Ct. at 2535–36.[13]

It may well be, as the Commonwealth also asserts, that Appellant cannot establish prejudice with regard to any failure on his trial counsel's part or, more broadly, a miscarriage of justice, *see supra* note 5 (discussing the three-part ineffective-ness standard and the miscarriage-of-justice standard pertain-ing to serial post-conviction petitions), particularly in light of the strength of the aggravating evidence. The PCRA court, however, did not address Appellant's claim on such terms, but rather, the court limited its opinion to the reasonable-strategy aspect of the ineffectiveness inquiry. Moreover, the psychiat-ric evidence is highly significant to the prejudice assessment, *see Gibson,* 597 Pa. at 423–24 & n. 11, 951 A.2d at 1123 & n. 11, and the evaluation of how justice was administered in the case. However, we do not have the court's explanation con-cerning the admissibility of such evidence on post-conviction review or an opinion discussing the justification for the limita-tion in the scope of the evidentiary proceedings.[14]

Given the above difficulties, we find that a remand is necessary to permit the post-conviction court to address them. Further, we will vacate the PCRA court's present order and relinquish jurisdiction to permit the preparation of a full record. The court is to prepare an opinion addressing all

however, the decisions of the United States Supreme Court and the conforming decisions of this Court demonstrate that there are limits to such deference.

**13.** Appellant's trial in this case pre-dates the seminal decision in *Strick-land v. Washington,* 466 U.S. at 668, 104 S.Ct. at 2052. There is no argument here, however, that *Strickland* broke new ground on any relevant point; indeed, the Commonwealth also relies on that decision in its brief. *See* Brief for Appellee at 13, 14, 16.

**14.** Similarly, while Appellant's claims may fail on grounds of waiver (to the degree that his layering efforts prove inadequate), *see generally Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003), the PCRA court did not address Appellant's claims on such terms.

claims raised in the amended post-conviction petition, expressly resolving areas of material, factual controversy and material credibility disputes via numbered factual findings. Further, the PCRA court is to permit the development of the mental-health mitigation evidence (as well as appropriate cross-examination and rebuttal evidence by the Commonwealth), or to provide a persuasive substantive explanation for why the presentation of such evidence should be precluded. Finally, since there seems to be a fair likelihood that the mitigation-related ineffectiveness issue ultimately will turn on the prejudice criterion of the ineffectiveness inquiry and/or the miscarriage-of-justice standard, the PCRA court is to develop a specific comparison of the mitigation case offered at trial with the credited evidence offered on post-conviction review, with the object of elaborating on why it is, or is not, reasonably probable that at least one juror might have assigned weight to Appellant's credited post-conviction evidence equal or greater than the substantial aggravation found by the sentencing jury. *Accord Gibson*, 597 Pa. at 423–24, 951 A.2d at 1122–23 (implementing a similar remand). To the degree that there is doubt as to whether the claims are finally resolvable without reference to the layering aspect, the court is authorized to take all action necessary to conform the record to the requirements of *McGill*, 574 Pa. at 574, 832 A.2d at 1014, including the admission of supplemental evidence. Again, given the protracted delay which already has occurred in this case, our intent is for the PCRA court to take all reasonable measures to avert an additional remand upon any further appeal.

In reply to the above, the dissent proposes to superimpose a facet of federal habeas corpus jurisprudence onto our review to justify a very narrow approach to the miscarriage of justice standard governing serial post-conviction review. *See* Dissenting Opinion, at 399. In doing so, however, the dissent does not acknowledge the discrete context in which the miscarriage of justice concept is applied within the federal scheme, or the distinct derivation in the Pennsylvania scheme.

As to the federal system, under *Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), the federal

miscarriage of justice standard requires a showing of actual innocence, either in terms of guilt or penalty. *See id.* at 339–40, 112 S.Ct. at 2518–19.[15] However, collateral review of serial petitions is not limited to the narrow form of miscarriage of justice equating to a showing of actual innocence. Rather, review under the federal "miscarriage of justice" standard is supplementary to the primary avenue permitting habeas corpus review upon a demonstration of "cause and prejudice." *See Sawyer,* 505 U.S. at 338–39, 112 S.Ct. at 2518.[16] Significantly, the availability of federal habeas corpus review upon cause and prejudice was developed as a core safeguard against the miscarriage of justice in its broader sense. *See Dretke,* 541 U.S. at 394, 124 S.Ct. at 1852; *see also Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986).[17] Further, claims of constitutionally deficient stewardship such as those presented here, *see, e.g., supra* note 7, are cognizable under the cause and prejudice standard. *See Dret-*

15. The *Sawyer* decision predated the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1220, which also contains provisions restricting prisoners' ability to pursue serial habeas petitions. The present discussion is centered on the law under *Sawyer,* since this is what the dissent invokes. In this regard, the principles governing state prisoner access to federal courts embody a "complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions." *McCleskey v. Zant,* 499 U.S. 467, 489, 111 S.Ct. 1454, 1467, 113 L.Ed.2d 517 (1991). It is beyond the appropriate scope of this appeal to delve deeply into the many nuances of federal doctrine; our limited purpose here is to respond to the dissent by providing what we regard as some necessary context.

16. Indeed, the federal miscarriage of justice or actual innocence standard functions as an exception to the cause and prejudice restriction. *See Dretke v. Haley,* 541 U.S. 386, 393, 124 S.Ct. 1847, 1852, 158 L.Ed.2d 659 (2004). Thus, it is designed to broaden the availability of review to further the interests of justice.

17. It is precisely because the United States Supreme Court regards the cause and prejudice standard as inadequate, in and of itself, to guard against injustice that the Court has fashioned its own "miscarriage of justice" or "actual innocence" standard as an additional safeguard. *See Murray,* 477 U.S. at 495–96, 106 S.Ct. at 2649. On the other hand, the Supreme Court regards cause and prejudice as sufficiently robust to justify its avoidance of succeeding entreaties to expand the "actual innocence" exception. *See Dretke,* 541 U.S. at 394, 124 S.Ct. at 1852–53.

*ke*, 541 U.S. at 394, 124 S.Ct. at 1852. *See generally Strick-land v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (recognizing that "[a]n ineffectiveness claim, however, as our articulation of the standards that govern decision of such claims makes clear, is an attack on the fundamental fairness of the proceeding whose result is challenged.").

It is apparent from the above that, under *Sawyer*, the concepts of cause and prejudice, and miscarriage of justice, as employed in doctrines governing federal collateral review, are inextricably intertwined. Thus, we fail to see how the "miscarriage of justice" exception to the federal cause and prejudice standard can be extricated from its discrete context and rational underpinnings and grafted onto the Pennsylvania scheme without considering whether other aspects of the theory must necessarily follow.[18]

In Pennsylvania, this Court, like the United States Supreme Court in the federal forum, has undertaken the difficult process of attempting to balance fairness and finality in addressing serial post-conviction petitions. This has yielded our miscarriage of justice requirement, which has been applied more generically than the federal standard invoked by the dissent in that it subsumes claims of fundamental unfairness in trial proceedings. The Pennsylvania approach arose as a compromise of two positions concerning the appropriate dispo-

18. We appreciate that the federal system differs from ours in that its principles are designed to incorporate substantial deference to the state courts. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 731, 111 S.Ct. 2546, 2555–56, 115 L.Ed.2d 640 (1991). This difference, however, would support a narrower approach to review by the federal courts than that which is available in the state courts, and not the converse.

In terms of our own review, we recognize the potential for subsequent federal habeas proceedings serves as a different kind of safeguard. Our aim, however, is for the Pennsylvania courts to put their own "Constitutional houses" in order first, so that the deference accorded by the federal courts is justified. *Fielding v. Le Fevre*, 548 F.2d 1102, 1106 (2d Cir.1977) ("The state courts must be afforded an opportunity to set their own Constitutional houses in order before the power of the federal court is invoked."). In the present case, as explained above, the opinion furnished by the PCRA court fails to provide the necessary groundwork for fulfilling this essential function.

sition of serial, post-conviction petitions. On the one hand, a plurality of Justices favored a flexible, circumstance-dependent inquiry which explicitly allowed for the possibility that deficient stewardship of counsel undermining trial fairness would justify serial collateral review. *See Commonwealth v. Alexander*, 495 Pa. 26, 36–39, 432 A.2d 182, 186–88 (1981) (plurality). Other Justices favored a more specific, narrower inquiry into whether the petitioner "raise[d] a colorable due process issue that significantly affects the truth determining process." *See id.* at 41–42, 432 A.2d at 189 (Flaherty, J., concurring).

The miscarriage of justice requirement was fashioned in *Commonwealth v. Lawson*, 519 Pa. 504, 549 A.2d 107 (1988), as an explicit "accommodation" among Justices in light of these competing views. *See id.* at 513, 549 A.2d at 112. *Lawson* left the operative phrase undefined, but it is significant here that neither of the positions subject to the accommodation was as narrow as the federal miscarriage of justice or "actual innocence" standard. Indeed, in applying the miscarriage of justice conception to the circumstances presented, the *Lawson* Court employed the general fairness notion and the concept of actual innocence distinctly. *See id.* at 514, 549 A.2d at 112 (applying the miscarriage of justice standard and reasoning that "the petitioner does not attack the fairness of the trial that resulted in his conviction, nor does he even assert that he was innocent of the criminal charges involved.").

There is no doubt that *Lawson* raised the bar for the pursuit of repetitive post-conviction petitions. However, it is also clear that, in light of concerns maintained by individual Justices, the standard was left purposely imprecise and did not foreclose the review of strong claims challenging the fundamental fairness of trials. Indeed, while certainly there is overlap, this Court has continued to treat the concepts of "miscarriage of justice" and "actual innocence" distinctly. *See, e.g., Commonwealth v. Fahy*, 558 Pa. 313, 330, 737 A.2d 214, 223 (1999) ("An appellant makes such a prima facie case [demonstrating a miscarriage of justice] only if he demonstrates that *either* the proceedings which resulted in his

conviction were so unfair that a miscarriage of justice oc-
curred which no civilized society could tolerate, *or* that he was
innocent of the crimes charged" (quoting *Commonwealth v.
Morales*, 549 Pa. 400, 409–10, 701 A.2d 516, 520–21 (1997))
(emphasis added)).[19]

With this background, we decline to alter the existing
Pennsylvania standard governing serial post-conviction review.
In addition to the difficulties in the grounding of the dissent's
approach developed above, there is no advocacy presented
here to support it.[20] Were this Court to consider a *sua sponte*
change in the review paradigm impacting on Appellant's peti-
tion, certainly he should be afforded an opportunity to re-
spond. Moreover, on the practical side, the existing standard
imposes a substantial hurdle to unwarranted claims, and the
Legislature's imposition of a one-year time limit for the filing
of a post-conviction petition has at least substantially mitigat-
ed the difficulties presented by repetitive efforts seeking

**19.** In Pennsylvania, much of the discussion of serial post-conviction
review was motivated by instances in which boilerplate allegations of
deficient stewardship were treated as "magic words" supporting the
affordance of review. *See Alexander*, 495 Pa. at 33–34, 432 A.2d at 185.
It is worth noting, then, that the present case is not merely a "magic
words" case. Here, the record demonstrates trial counsel presented
only limited and, indeed, substantially harmful testimony from Appel-
lant as the sole evidence in mitigation and failed to make any argument
to the jury whatsoever to support a case for life over death. Since trial
counsel continued to represent Appellant on direct appeal, the post-
conviction setting represented his first opportunity to challenge coun-
sel's stewardship. Nevertheless, initial post-conviction counsel is al-
leged to have violated a court directive to present support for the claim
of deficient stewardship in the development of mitigation. *See supra*
note 7. Appellant has now advanced the evidence he contends should
have been presented by effective counsel, but the PCRA court refused to
consider it on a developed record and to pass on its believability and
force. Moreover, as discussed, the reasoning offered by the court to
support its decision to deny relief is flawed and incomplete. In such
circumstances, it is far from clear that the present petition represents
an instance of abusive litigation, as was under discussion in *Alexander*
and its progeny.

**20.** To the contrary, the Commonwealth accepts the present Pennsylva-
nia formulation of the miscarriage of justice standard and apprehends
that federal habeas review is available upon a showing of cause and
prejudice or a miscarriage of justice in the form of actual innocence.
*See* Brief for Appellee at 8–10.

judicial redress. *See Commonwealth v. Williams,* 566 Pa. 553, 565, 782 A.2d 517, 524 (2001) ("The practical effect of the legislative scheme as we have interpreted it is to channel claims for post-conviction relief through the PCRA, to ensure that the post-conviction review process remains open for review of certain fundamental claims implicating the reliability of the conviction and/or sentence, but to limit this opportunity in most cases to a single, counseled petition."). Thus, it is questionable whether *Lawson* needs to be revisited, and, at the very least, this can await an appropriate case.

The dissent also references the Commonwealth's assertion that Appellant has not invoked the miscarriage of justice standard and, on this basis, chastises Appellant for failing to do so. *See* Dissenting Opinion, at 495–97, 967 A.2d at 399–400. Appellant, however, did in fact couch his claims in terms of miscarriage of justice, *see* Brief for Appellant at 15, and explains in his reply brief, "Appellant's Initial Brief expressly states that his 'claims show that his conviction and death sentence are a miscarriage of justice,' Appellant's Initial Brief at 15, and the discussion of those claims shows that they meet the 'miscarriage' standard as described in the rulings of this Court and the Superior Court." Reply Brief for Appellant at 1.

Further, the dissent suggests a finding on our part that Appellant adequately addressed his burden of making a strong prima facie showing of a miscarriage of justice. *See* Dissenting Opinion, at 497 n. 3, 967 A.2d at 400 n. 3. In point of fact, to this juncture, we had expressly reserved any decision on the point, relegating consideration of the miscarriage-of-justice question to the PCRA court on remand. We will say, however, that, a proven, abject failure on the part of capital counsel to investigate mitigating circumstances, where there is a wealth of strong and readily available mitigation, coupled with a failure to make any case whatsoever for life to the jury, undermines fundamental fairness and can comprise a miscarriage of justice under the existing *Lawson* standard.[21] Certainly, as well, Appellant has endeavored to couch the present

21. We recognize that the strength of the aggravating circumstances proven by the Commonwealth is also a factor bearing on a complete prejudice or miscarriage of justice assessment.

matter in such terms. *See, e.g.,* Initial Brief for Appellant at 17 ("Having investigated and presented nothing, counsel made an empty argument to the jury, taking less than two transcript pages. Counsel did not present an argument for a life sentence"); *id.* at 18–22 (summarizing the proffer of mitigation evidence not presented at trial).[22]

Our interest here is also broader than merely directing the outcome of this case. We intend to provide an orderly system of post-conviction adjudication that produces fair and just results, anchored upon governing law and rational reasoning. In this regard, our opinion is not intended to speak only to this case, but to reflect the norm for all capital post-conviction matters.

Perhaps to this point our discussion has been too muted. In very clear terms, we are dismayed at the exceptionally poor

**22.** The dissent also faults Appellant for discussing the concept of miscarriage of justice within the waiver section of his brief, and for failing to include a citation to *Lawson. See* Dissenting Opinion, at 497 n. 3, 967 A.2d at 400 n. 3. The dissent is correct that Appellant's treatment of *Lawson,* as such, is not ideal. Nevertheless, in substance, we are able to comprehend his point as follows.

On the matter of waiver, the miscarriage of justice standard operates as a bar to claims based upon the adjudication of a previous post-conviction petition in which the claims were not raised. Therefore, Appellant's treatment of the standard in connection with matters of issue preservation is not wholly inapt. As to the substance, *Lawson* used the term "miscarriage of justice" to signify a high degree of fundamental unfairness—as discussed above this is exactly what Appellant argues, throughout his briefs, occurred at his trial in terms of an alleged, severe abdication by trial counsel of his penalty-phase responsibilities. Although the dissent highlights that Appellant did not reference *Lawson* directly in his initial brief, it should be noted that he did furnish a citation to a decision applying *Lawson* in his discussion of the asserted miscarriage of justice. *See* Brief for Appellant at 15 (citing *Commonwealth v. McFadden,* 402 Pa.Super. 517, 522, 587 A.2d 740, 742 (1991)). There is no requirement that litigants must cite original-source legal authority.

Finally, and again, the PCRA court did not invoke the miscarriage of justice standard in disposing of Appellant's claims. It is unsurprising, then, that it is not the primary focus of Appellant's challenge to the PCRA court's decision or the main focus of our review for error in our role as the court of original appellate jurisdiction. Rather, the dissent's invocation of *Lawson* is tantamount to harmless-error review, albeit that it is our perspective that the matter of harmlessness is subject to reasonable controversy at this juncture, for the reasons discussed.

quality of the treatment of the present post-conviction petition, which we do not regard as a completely isolated incident. *See, e.g., Commonwealth v. Williams,* 557 Pa. 207, 224–25, 732 A.2d 1167, 1176 (1999) (reflecting one of several post-conviction cases in which PCRA judges have attempted to satisfy their obligation to prepare independent opinions via wholesale adoption of Commonwealth briefs); *see also id.* at 254, 732 A.2d at 1192 (Castille, J., concurring) ("The PCRA court's failure to draft an opinion addressing the claims constitutes an abdication of the trial court's duty which cannot be condoned."). The dissent does not deny that the reasons given by the PCRA court for rejecting the one claim the court addressed are badly out of sync with governing law and rational review, or that no reason whatsoever was given to justify its rejection of the remaining claims. While we remain sympathetic to the difficulties encountered by the common pleas courts in the capital arena, particularly in light of their limited resources, we cannot accept superficial reasoning and wholesale omissions as an appropriate response.

Finally, when a post-conviction court contemplates dismissal of a petition for failure to adequately address legal requirements, as a general rule it must give prior notice to the petitioner of its intent to dismiss and of the defect, and the opportunity is thus provided for the petitioner to seek leave to file a curative amendment. *See* Pa.R.Crim.P. 909(B)(2)(a); *see also Commonwealth v. Williams,* 566 Pa. 553, 568–69, 782 A.2d 517, 526–27 (2001). Were we to apply the dissent's approach of selecting a reason for dismissal that was not the basis for the PCRA court's decision, the purpose of this rule would be circumvented. Although it is acceptable to apply alternative grounds on appeal in cases where the appropriate outcome is clear and free from doubt, for the above reasons we differ with the dissent's position that the outcome here is a foregone conclusion.

The order of the PCRA court is vacated, and the matter is remanded for further proceedings and an opinion consistent with the above.

Jurisdiction is relinquished.

Justice GREENSPAN did not participate in the consideration or decision of this case.

Justice BAER and Justice TODD join the opinion.

Chief Justice CASTILLE files a joining concurring opinion.

Justice EAKIN files a concurring opinion.

Justice McCAFFERY files a dissenting opinion.

Chief Justice CASTILLE, Concurring.

I join the Majority Opinion, subject to the following observations.

With respect to the question of counsel ineffectiveness at the penalty phase, which is the primary subject of the Majority Opinion, I confess that I am not sure what courts are supposed to do with ancient capital cases, such as this one, particularly in light of the changing federal jurisprudence in capital cases.[1] This case was tried in 1981, before *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) itself was decided, and before this Court had decided any cases under the death penalty statute adopted in response to the U.S. Supreme Court's 1970s-era suspension of capital punishment. The jurisprudential landscape available to trial counsel, L. Carter Anderson, Esq., in preparing a death case in 1981 was not particularly helpful.

More importantly, the facts here made the penalty-phase particularly difficult. The single aggravating circumstance was appellant's significant history of violent felony convictions, 42 Pa.C.S. § 9711(d)(9). Appellant's criminal history was both grave and unique. Prior to the instant trial, appellant had been convicted of murder on two separate occasions, the latter of which involved the capital murder of a Philadelphia police officer while appellant was at large after the murder he

---

1. The Majority notes the unfortunate delay in this case following the filing of the notice of appeal. The pre-briefing delay was occasioned by the PCRA court's failure to forward the record and its brief and incomplete opinion. In non-capital cases involving protracted delay, the appellant typically takes some action to move his appeal along; capital cases, of course, present the opposite incentive.

committed here. *See Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460, 461 (1984). This history distinguishes appellant from the great majority of other first-degree murderers.

I do not suggest that this daunting circumstance facing counsel can excuse or render reasonable a failure to investigate his client's background in preparation of a penalty phase defense. But, by the same token, in assessing *Strickland* prejudice, there obviously is some real-world force in counsel's recognition that playing up appellant's personal history was not likely to engender sympathy for a defendant well on his way to becoming a serial murderer. I think it is well-nigh impossible for appellant to secure penalty phase relief under *Strickland*, given that he is a three-time murderer. I have explained my general view in this regard at some length in my recent Concurring Opinion in *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1151 (2008) (Castille, C.J., joined by McCaffery, J., dissenting). Relief should be even more difficult to obtain as this is appellant's second collateral attack, and thus, he must prove that the death verdict was a miscarriage of justice. *See Commonwealth v. Lawson*, 519 Pa. 504, 549 A.2d 107 (1988).

But the primary difficulty in this appeal is the distressingly deficient analysis engaged in by the PCRA court, which the Majority has detailed and explained at length. The PCRA court's lapse includes its incomplete factual analysis of the claim of counsel ineffectiveness in preparing and presenting a penalty phase case, its failure to recognize other complexities (such as the necessity for layering and the necessity to prove a miscarriage of justice), and its inexplicable failure to address appellant's other claims. The fact that I believe it is unlikely in the extreme that *Strickland* prejudice and a *Lawson* miscarriage of justice can be proven in this case respecting the penalty phase does not and cannot excuse the PCRA court of its responsibility to engage in a responsible, substantive evaluation of appellant's claims respecting both the guilt and the penalty phases of trial.

In *Gibson*, I noted that my joinder in the remand there was occasioned by, *inter alia*, "respect for the care and prudence

in the Majority's explanation of the deficiencies in the PCRA court's analysis; [and] the importance of emphasizing to the courts below their duties of precision in capital appeals...." *Id.* at 1148. Ultimately, those considerations likewise command my joinder here.

Justice EAKIN, Concurring.

Assuming there is no waiver, *see* Majority Op., at 482–83 n. 14, 967 A.2d at 391 n. 14, I reiterate my position that counsel's performance regarding mitigating evidence should be critiqued according to the law existing at the time of trial, not according to later-announced standards. *See, e.g., Commonwealth v. Sattazahn,* 597 Pa. 648, 952 A.2d 640, 671 (2008) (Eakin, J., concurring and dissenting); *Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110, 1155 (2008) (Eakin, J., concurring and dissenting); *Commonwealth v. Gorby,* 589 Pa. 364, 909 A.2d 775, 795–96 (2006) (Castille, J., dissenting). "Any other standard would require counsel to predict changes in the law and turn representation into prognostication." *Commonwealth v. Williams,* 597 Pa. 109, 950 A.2d 294, 324 (Eakin, J., concurring). In all other respects, I join the majority's opinion.

Justice McCAFFERY, Dissenting.

I respectfully dissent from the result reached by the Majority. I believe that as a matter of law, Appellant has not made and could not make, under any circumstances, a strong *prima facie* showing that the denial of this serial PCRA petition resulted in a miscarriage of justice. Specifically, he cannot demonstrate that the proceedings which resulted in his being sentenced to death were so unfair that no civilized society could tolerate the outcome. Without such a showing, I believe that relief under the PCRA is not warranted. Therefore, I depart from both the analysis engaged in and the result reached by the Majority in awarding Appellant relief. Rather, I would affirm the order denying relief from the 1981 jury verdict that Appellant be sentenced to death for this murder, Appellant's third.

494

The Majority remands this matter primarily for the PCRA court to consider Appellants claim that trial counsel was ineffective for failing to present mental-health/psychiatric mitigation evidence at the penalty phase of trial, and relies upon the decision in *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1122–23, for doing so. *See* op. at 482–85, 967 A.2d at 391–92. However, *Gibson* involved a first post-conviction request for collateral relief in which the petitioner was not required to establish that a miscarriage of justice had occurred.

I believe the Majority accords insufficient weight to the fact that Appellant has already had the benefit of collateral review of his death sentence. The consequences of this are of great significance: in the context of a serial PCRA petition, unless Appellant can make a strong *prima facie* showing that a miscarriage of justice has resulted, he is not entitled to any relief from his judgment of sentence. *Commonwealth v. Lawson*, 519 Pa. 504, 549 A.2d 107, 112 (1988) (holding that a second request for collateral relief "will not be entertained unless a strong *prima facie* showing is offered to demonstrate that a miscarriage of justice may have occurred."). A petitioner makes a *prima facie* showing if he "demonstrates that either the proceedings which resulted in his conviction were so unfair that a miscarriage of justice occurred which no civilized society could tolerate, or that he was innocent of the crimes for which he was charged." *Commonwealth v. Carpenter*, 555 Pa. 434, 725 A.2d 154, 160 (1999) (quoting *Commonwealth v. Morales*, 549 Pa. 400, 701 A.2d 516, 520–21 (1997)). The Lawson miscarriage of justice standard also applies to the analysis of claims of counsel's ineffectiveness during the penalty phase of a capital case. *See Commonwealth v. Szuchon*, 534 Pa. 483, 633 A.2d 1098 (1993).

Here, Appellant does not assert that he is actually innocent of the murder. Therefore, in order to establish that a miscarriage of justice occurred, he would have to show that the proceedings which resulted in his being sentenced to death were so unfair that no civilized society could tolerate the outcome.

In the context of "successive, abusive or defaulted" applications for federal *habeas corpus* relief from persons sentenced to the penalty of death, the United States Supreme Court has held that a claim of counsel's ineffectiveness based upon failure to present additional mitigating evidence cannot meet the miscarriage of justice standard. *Sawyer v. Whitley*, 505 U.S. 333, at 345–347, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), *construed in Bell v. Thompson*, 545 U.S. 794, 812, 125 S.Ct. 2825, 162 L.Ed.2d 693 (2005). Only evidence that affects a defendant's **eligibility** for the death penalty can support a miscarriage of justice claim in the capital sentencing context:

> The psychological evidence petitioner alleges was kept from the jury due to the ineffective assistance of counsel does not relate to petitioner's guilt or innocence of the crime. Neither does it relate to either of the aggravating factors found by the jury that made petitioner eligible for the death penalty. Even if this evidence had been before the jury, it cannot be said that a reasonable juror would not have found both of the aggravating factors that make petitioner eligible for the death penalty. Therefore, as to this evidence, petitioner has not shown that there would be a fundamental miscarriage of justice for the Court to fail to reexamine the merits of this successive claim.

*Sawyer* at 348–49, 112 S.Ct. 2514 (footnotes omitted).[1]

In Pennsylvania, in order to find a defendant eligible for the death penalty, a jury must unanimously find at least one aggravating circumstance beyond a reasonable doubt. 42 Pa.C.S. § 9711(c)(1)(iv); *Commonwealth v. Roney*, 581 Pa. 587, 866 A.2d 351, 360 (2005).[2] Thus, if the alleged ineffective-

1. *See also Szuchon v. Lehman*, 273 F.3d 299, 324 (3rd Cir.2001) (holding that the miscarriage of justice test is not met where the basis for the claim is that an alleged constitutional error prevented additional mitigating evidence from being introduced at a penalty phase hearing).

2. *See also Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 798, n. 41 (2004) ("The capital sentencing process implicates two discrete determinations; the first is eligibility, in which the statutory scheme narrows the class of persons who may be subject to the death penalty; the second is selection, at which point the sentencer decides whether a person who is eligible for the death penalty should receive such punishment. Aggravating circumstances provide the means of narrowing the

ness of trial counsel pertains to trial counsels failure to introduce additional mitigating evidence, by definition it does not pertain to an aggravating circumstance, and thus does not and cannot affect the defendant's eligibility for the death penalty. I believe our High Court's determination that a federal petitioner sentenced to death is entitled to no relief from that sentence despite his claim of trial counsel's ineffectiveness for failing to adduce additional mitigating evidence conclusively refutes any notion that such a claim may result in proceedings that are so unfair as to constitute a miscarriage of justice that no civilized society could tolerate. That is the basis for my belief that Appellant cannot sustain his burden in this serial PCRA petition.

I am not advocating a *sua sponte* change in our review paradigm, as suggested by the Majority (*see* op. at 394). Rather, I am suggesting that this Court place proper emphasis upon the heavy burden that a serial PCRA petitioner bears in establishing a strong *prima facie* showing of a miscarriage of justice under *Lawson*. In the present case, I believe that Appellant cannot meet that burden, for the reasons outlined above. In addition, the Commonwealth has brought to this Court's attention the fact that Appellant has not so much as acknowledged his burden under *Lawson*, and the Commonwealth urges that on this basis alone, the denial of relief should be summarily affirmed. *See* Commonwealth's Brief at 8–9. Appellant has had ample opportunity to avail himself of advocacy that could have served as an aid to this Court's resolution of his claim of error in the denial of his request for

class for purposes of eligibility and, under the Pennsylvania statute, along with mitigating circumstances and victim impact evidence, serve as the bases for the selection decision.") (citation omitted); *Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75, 101 (2004) ("In the eligibility determination, the statutory scheme must narrow the class of persons for whom the death penalty applies and justify the imposition of such penalty as compared to others found guilty of murder. One means of narrowing the class is by prescribing aggravating circumstances that must exist before the death penalty can be imposed, which serves to appropriately channel the sentencer's discretion. The selection decision is implicated when the sentencer decides whether a defendant who is eligible for the death penalty should in fact receive that sentence.") (citations omitted).

post-conviction relief. However, while I believe it is a burden that is, in this instance, insurmountable, Appellant has simply chosen to ignore his burden.[3]

In light of the United States Supreme Court's definitive holding that the failure to present additional mitigating evidence at the penalty phase of a capital case does not and cannot be considered a miscarriage of justice, I believe it is a waste of judicial resources to remand this case for any further proceedings. Accordingly, I would affirm the PCRA court's denial of relief. Because the Majority remands for further proceedings on Appellant's claim of ineffective assistance of counsel and does not consider whether Appellant would ever be able to meet the miscarriage of justice test, I respectfully dissent.

3. I disagree with the Majority that Appellant adequately addresses his burden of making a strong *prima facie* showing that he is the victim of a miscarriage of justice (see op. at 488 n. 21, 967 A.2d at 395 n. 21). Rather, Appellant's single-sentence reference to a "miscarriage of justice" on page 15 of his principal brief is made in the context of his argument that none of the issues he currently raises has been waived. Appellant does not cite *Lawson* or in any manner refer to his enhanced burden as a serial PCRA petitioner. Similarly, Appellant's belated citation to *Lawson* in his reply brief is unaccompanied by any developed argument concerning his burden. I find these cursory allusions to a "miscarriage of justice" to be precisely the type of issue presented in a "boilerplate fashion" that the Majority attributes to deficient stewardship. See op. at 474 n. 7, 967 A.2d at 386 n. 7.